﻿Citation Nr: AXXXXXXXX
Decision Date: 02/28/20 Archive Date: 02/28/20

DOCKET NO. 190528-49749
DATE: February 28, 2020

ORDER

Entitlement to service connection for gastroesophageal reflux disorder (GERD) is denied.

Entitlement to service connection for a right ankle disability is denied.

Entitlement to service connection for sleep apnea is denied.

Entitlement to service connection for kidney stones is denied.

Entitlement to an initial rating in excess of 10 percent for right knee patellofemoral syndrome is denied.

Entitlement to an initial rating of 30 percent for bilateral pes planus and plantar fasciitis is granted.

Entitlement to compensation under 38 U.S.C. § 1151 for kidney stones is denied.

Entitlement to compensation under 38 U.S.C. § 1151 for hematuria is denied.

REMANDED

Entitlement to service connection for a right hip disability is remanded.

Entitlement to service connection for a left hip disability is remanded.

Entitlement to service connection for a left knee disability is remanded.

FINDINGS OF FACT

1. GERD was not manifested in service, and is not otherwise attributable to service or service-connected disabilities. 

2. A right ankle disability was not shown in service and is not otherwise attributable to service or service-connected disabilities. 

3. Sleep apnea was not shown in service and is not otherwise attributable to service or service-connected disabilities. 

4. Kidney stones were not shown in service and are not otherwise attributable to service or service-connected disabilities.

5. The Veteran’s right knee disability is manifested by pain and slight limitation of motion.

6. The Veteran bilateral pes planus was mild prior to entrance in service and is currently severe.

7. VA treatment, including prescribing of medications to treat service-connected headaches, did not proximately cause kidney stones.

8. VA treatment, including prescribing of medications to treat service-connected headaches, did not proximately cause hematuria.

CONCLUSIONS OF LAW

1. The criteria for entitlement to service connection for GERD have not been met. 38 U.S.C. §§ 1101, 1110, 1131; 38 C.F.R. §§ 3.102, 3.303, 3.310.

2. The criteria for entitlement to service connection for a right ankle disability have not been met. 38 U.S.C. §§ 1101, 1110, 1131; 38 C.F.R. §§ 3.102, 3.303, 3.310.

3. The criteria for entitlement to service connection for sleep apnea have not been met. 38 U.S.C. §§ 1101, 1110, 1131; 38 C.F.R. §§ 3.102, 3.303, 3.310.

4. The criteria for entitlement to service connection for kidney stones have not been met. 38 U.S.C. §§ 1101, 1110, 1131; 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310.

5. The criteria for entitlement to an initial rating in excess of 10 percent for right knee patellofemoral syndrome have not been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 4.7, 4.71a, Diagnostic Code 5260.

6. The criteria for entitlement to an initial rating of 30 percent for bilateral pes planus and plantar fasciitis have been met. 38 U.S.C. §§ 1155, 5107; 38 C.F.R. §§ 3.322, 4.7, 4.22, 4.71a, Diagnostic Code 5276.

7. The criteria for entitlement to compensation under 38 U.S.C. § 1151 for kidney stones have not been met. 38 U.S.C. §§ 1151, 5107; 38 C.F.R. §§ 3.102, 3.361.

8. The criteria for entitlement to compensation under 38 U.S.C. § 1151 for hematuria have not been met. 38 U.S.C. §§ 1151, 5107; 38 C.F.R. §§ 3.102, 3.361.

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Veteran served in the Army Reserve from March 1990 to August 1997, and in the Air Force Reserve from August 1997 to January 2006. He had a period of active Army service from June 13, 1990 to October 26, 1990.

On August 23, 2017, the President signed into law the Veterans Appeals Improvement and Modernization Act, Pub. L. No. 115-55 (to be codified as amended in scattered sections of 38 U.S.C.), 131 Stat. 1105 (2017), also known as the Appeals Modernization Act (AMA). This law creates a new framework for Veterans dissatisfied with VA’s decision on their claim to seek review. The Veteran chose to participate in VA’s test program RAMP, the Rapid Appeals Modernization Program. This decision has been written consistent with the new framework.

The Veteran selected the Higher-Level Review lane when he submitted the RAMP election form in September 2018. However, as development was underway pursuant to a Board of Veterans’ Appeals remand under the legacy system, the Regional Office (RO) in the February 2019 and April 2019 RAMP decisions considered the evidence of record at the time of those decisions, and informed the Veteran that his claims were being considered under the supplemental claim process.

The Veteran timely appealed the February 2019 and April 2019 RAMP rating decisions to the Board and requested Direct Review. 

Evidence, including VA treatment records and VA examinations conducted in November 2019 and December 2019, was added to the claims file during a period of time when new evidence was not allowed. Therefore, the Board may not consider this evidence. See Veterans Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115-55, § 2(w)(1), 131 Stat. 1105, 1114 (2017). The Veteran may file a Supplemental Claim and submit or identify this evidence. See § 2(i)(1), 131 Stat. at 1109. If the evidence is new and relevant, VA will issue another decision on the claim, considering the new evidence in addition to the evidence previously considered. Id. Specific instructions for filing a Supplemental Claim are included with this decision.

In the February 2019 RAMP decision, the AOJ found new and relevant evidence was submitted to warrant readjudicating the claims of entitlement to service connection for left hip, right hip, left knee, and right ankle disabilities, as well as the claims for entitlement to service connection for GERD and sleep apnea. The Board is bound by these favorable findings. 38 C.F.R. § 3.104 (c). 

Additionally, in the April 2019 RAMP decision, the AOJ considered the claims for service connection for kidney stones, and for compensation for kidney stones and hematuria under 38 U.S.C. § 1151 on the merits; thus, receipt of new and relevant evidence was effectively conceded by the AOJ.

Service Connection

Service connection may be granted for a current disability arising from a disease or injury incurred in or aggravated by active service. 38 U.S.C. §§ 1110, 1131. Service connection may be granted for any disease diagnosed after discharge when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303 (d). Service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of an in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the current disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection also may be granted for any disease diagnosed after discharge, when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303 (d). 

Certain chronic diseases if manifest to a compensable degree within one year after separation from active duty, may be presumed to have been incurred in or aggravated by service. 38 U.S.C. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309.

Service connection may also be established on a secondary basis for a disability which is proximately due to or the result of service-connected disease or injury. 38 C.F.R. § 3.310 (a). Establishing service connection on a secondary basis requires evidence sufficient to show (1) that a current disability exists and (2) that the current disability was either (a) proximately caused by or (b) proximately aggravated by a service-connected disability. Allen v. Brown, 7 Vet. App. 439, 448 (1995) (en banc). Further, service connection may not be awarded on the basis of aggravation without establishing a pre-aggravation baseline level of disability and comparing it to the current level of disability. 38 C.F.R. § 3.310 (b).

1. Entitlement to service connection for gastroesophageal reflux disorder (GERD) 

The AOJ in the February 2019 RAMP decision rendered favorable findings that the Veteran was service-connected for fibromyalgia and had a diagnosis of GERD in June 2011.

The Veteran contends that he has GERD that is secondary to medications used to treat his service-connected fibromyalgia.

His service treatment records do not show a diagnosis of GERD.

A March 2015 opinion of a VA physician was that the Veteran’s GERD was “less likely than not (much less than 50% probability) proximately due to or the result of the Veteran’s service-connected fibromyalgia or the medications used to treat it.” The physician noted that the Veteran’s GERD is “most likely caused by (much greater than 50% probability) his chronic obesity x decades (66 inches tall, 233 lbs on 12/22/14) and his chronic tobacco (cigar)use.” The Veteran’s “diagnosis and treatment of his GERD predates his claimed fibromyalgia. All of his [service treatment records] are silent for a diagnosis of fibromyalgia. GERD diagnosis and treatment predates documentation of Methocarbamol use. GERD treatment predates documentation of Naproxen/Ibuprofen treatment.”

At a September 2015 VA examination, the Veteran reported being diagnosed with GERD in 1993 and symptoms became worse after the diagnosis of fibromyalgia in 1995. The examiner opined that the Veteran’s GERD was not due to fibromyalgia, as GERD symptoms occurred prior to his diagnosis of fibromyalgia.

A VA physician examined the Veteran and provided an opinion in January 2019. The examiner stated that there was not sufficient documentation of the Veteran’s GERD symptoms prior to diagnosis of fibromyalgia in 1995 to determine a baseline of severity of symptoms prior to claimed aggravation. Regardless of an established baseline, the examiner opined that the Veteran’s GERD was not at least as likely as not aggravated beyond its natural progression by a service connection condition or medication used to treat such, because based on review of the Veteran’s medical records, his GERD was stable and well-controlled. The examiner listed specific notations in the Veteran’s treatment records from 2011 to 2018, all listing the Veteran’s GERD symptoms as “well controlled” or “improved.”

The Board finds the medical opinions of record highly probative in determining whether the Veteran’s GERD was caused or aggravated by a service-connected disability, or medication used to treat such, as they are shown to have been based on a review of the Veteran’s record and are accompanied by a sufficient explanation. Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008).

The Veteran contends in a May 2019 written statement that the opinions of record are inadequate as they do not address whether medications taken for all his service-connected disabilities have caused or aggravated his GERD. However, as the Veteran’s previous contentions only addressed his GERD in relation to his fibromyalgia and medications used to treat it, the Board does not find a pre-decisional duty to assist error in this case.

The Board acknowledges the Veteran’s assertions that his GERD was caused or aggravated by his service-connected disabilities or medications taken for such. However, as this issue is medically complex, as it involves internal disease processes and requires knowledge of interpretation of complicated diagnostic medical testing, he is not competent to provide a nexus opinion in this case. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007).

Since the competent and probative evidence of record fails to indicate that the Veteran’s GERD had onset in, or is otherwise related to service; or, that it was either caused or aggravated by service-connected disabilities, service connection is not warranted. 

As the preponderance of the evidence is against the claim under any applicable theory of service connection, the benefit of the doubt rule does not apply. 38 U.S.C. § 5107 (b); Gilbert, 1 Vet. App. at 53-56.

2. Entitlement to service connection for a right ankle disability

The AOJ in the February 2019 RAMP decision rendered favorable findings that the Veteran was involved in a motor vehicle accident in service in September 1990, and that he had a diagnosis of right ankle disability incurred in 2013.

The Veteran contends that he has a current right ankle disability that was either incurred in the motor vehicle accident in service in September 1990 or is secondary to service-connected pes planus with plantar fasciitis.

The Veteran reports that he rolled his ankle in service in September or October 1997. The available service treatment records do not show any complaints or treatments related to a right ankle injury.

Service treatment records note that the Veteran suffered a concussion and minor bruising in the MVA in September 1990; no right ankle injury or complaint is noted.

A September 2013 Disability Benefits Questionnaire (DBQ) noted the Veteran had increasing right ankle pain for the past few months.

In December 2015 the Veteran was seen with a complaint of right ankle pain for two days. A December 2015 right ankle X-ray noted a small chip fracture off the superior talus. 

A May 2016 MRI of the right ankle showed evidence of remote ankle sprain. A June 2016 podiatry consultation noted the Veteran’s gait was normal. 

A VA examiner in January 2019 opined that the Veteran’s right ankle disability was less likely as not (50% or greater probability) proximately due to or the result of the Veteran’s service-connected condition foot condition. “Given the history, physical examination and review of the files, patient’s right ankle injury does not seem to be associated with the feet condition…It does not seem to be associated with MVA 1990’s.”

The Board finds the medical opinion of record adequate as it was based on review of the medical evidence of record. 

While the Veteran has reported that he injured his right ankle in service, the service treatment records do not document any such injury, and he did not seek treatment for right ankle pain until many years after service.

The Board acknowledges the Veteran’s assertions that his right ankle disability was incurred in service or was caused or aggravated by a service-connected disability. However, as this issue is medically complex, as it involves internal disease processes and requires knowledge of interpretation of complicated diagnostic medical testing, he is not competent to provide a nexus opinion in this case. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007).

Since the competent and probative evidence of record fails to indicate that the Veteran’s right ankle disability had onset in, or is otherwise related to service; or, that it was either caused or aggravated by service-connected disabilities, service connection is not warranted. 

As the preponderance of the evidence is against the claim under any applicable theory of service connection, the benefit of the doubt rule does not apply. 38 U.S.C. § 5107 (b); Gilbert, 1 Vet. App. at 53-56.

3. Entitlement to service connection for sleep apnea 

The AOJ in the February 2019 RAMP decision rendered a favorable finding that the Veteran was diagnosed with sleep apnea by sleep study in August 2014.

The service treatment records do not show any findings or complaints related to sleep apnea.

The Veteran has claimed that his sleep apnea is secondary to GERD. As noted above, service connection is not in effect for GERD, thus there is no basis for a finding of secondary service connection for sleep apnea as caused or aggravated by GERD. 

In October 2014 a VA physician opined that the Veteran’s sleep apnea was less likely than not proximately due to or the result of the Veteran’s service-connected traumatic brain injury. The examiner noted that “TBI is not known in the medical literature to lead to sleep apnea.”

In March 2015, a VA physician opined that “sleep apnea is not caused by GERD. Review of well-established clinical medicine and evidence-based medical literature does not support the Veteran’s claim. He was diagnosed with mild OSA on 8/22/14 at the age of 42. This Veteran’s sleep apnea is most likely (much greater than 50% probability) due to his chronic obesity x decades (overweight on enlistment exam). This Veteran has numerous clinically significant risk factors for the development of sleep apnea, including but not limited to his: age (>35), male gender, obesity, upper airway soft tissue abnormalities (Mallampati IV, per Sleep consult 8/22/14 : “ Very crowded oropharynx. I was unable to even depress his tongue”) smoking (cigars) and family history (mother snores). Any of these risk factors individually can cause his mild sleep apnea. Any of these risk factors in combination can cause his mild sleep apnea.”

A VA examiner in January 2019 opined that the risk factors for the Veteran’s sleep apnea were advancing age, obesity, and craniofacial morphology or upper airway soft tissue abnormalities. 

In his May 2019 written statement, the Veteran contends that his sleep apnea could be related to his service-connected psychiatric disability. He had not previously contended that service connection was warranted on this basis, thus there is no pre-decisional duty to assist violation in not obtaining an opinion addressing this point. Nevertheless, the Board notes that there is no medical evidence of record supporting this contention.

The Board acknowledges the Veteran’s assertions that his sleep apnea was caused or aggravated by his service-connected disabilities. However, as this issue is medically complex, as it involves internal disease processes and requires knowledge of interpretation of complicated diagnostic medical testing, he is not competent to provide a nexus opinion in this case. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007).

Since the competent and probative evidence of record fails to indicate that the Veteran’s sleep apnea had onset in, or is otherwise related to service; or, that it was either caused or aggravated by service-connected disabilities, service connection is not warranted. 

As the preponderance of the evidence is against the claim under any applicable theory of service connection, the benefit of the doubt rule does not apply. 38 U.S.C. § 5107 (b); Gilbert, 1 Vet. App. at 53-56.

4. Entitlement to service connection for kidney stones

The AOJ in the April 2019 RAMP decision rendered favorable findings that the Veteran diagnosed with kidney stones in 2015; that kidney stones were a chronic disability that had been manifest to a degree of 10 percent or more following service.

The service treatment records do not show any complaints or findings related to kidney stones.

The evidence does not show that the Veteran’s kidney stones were manifested within the first post-service year. 38 C.F.R. §§ 3.307, 3.309.

The Veteran asserts that he developed kidney stones and hematuria as a result of topiramate, medication prescribed for his service-connected migraine headaches.

The Veteran asserts that he was taking the hypertensive medication hydrochlorothiazide which interacted negatively to increase the level of topiramate in his body and resulted in his kidney stones. 

The Veteran submitted a medical treatise noting that hydrochlorothiazide increases the level of topiramate and that the addition of hydrochlorothiazide to topiramate therapy may require an adjustment of the topiramate dose. 

A VA examiner in September 2015 noted that the Veteran developed kidney stones with hematuria after being placed on Topamax for headaches. “One of the potential side effects of Topamax is kidney stones.” 

A VA medical opinion was obtained in November 2015. The physician noted that the Veteran had been prescribed only 39 tablets of topiramate in August 2014 without renewal and such a small amount of topiramate used for a very short period of time would not cause any increased predisposition to kidney stones. The physician noted that increased predisposition to kidney stones is a rare known side effect of longterm treatment with topiramate.

A VA physician reviewed the record in March 2019 and found it less likely than not that the Veteran’s kidney stones were caused by or became worse as a result of the medications prescribed. She noted that “there is no evidence to suggest the HCTZ interacted negatively to increase the level of topiramate in his body and thus resulted in his kidney stones. From his records and labs: There is no evidence to suggest he had elevated blood or kidney levels of topiramate. The Veteran was only prescribed a 1 month supply of Topiramate 50 mg (39 tablets for the 30 day titration to be taken starting with 1/2 tablet for the first week and then titrating up over the next 3 weeks to a total of 100 mg the 4th week). This was a low dose, used for a very short period. He had no refills; and the prescription expired on 8/30/14. The Topiramate dose prescribed is the dosing schedule recommended on the manufacturer’s label when initiating topiramate. There was no indication to prescribe a lower dose of topiramate given the Veteran’s use of hydrochlorothiazide. No dose adjustment is necessary when the GFR is >70, regardless of whether or not he is on Hydrochlorothiazide.”

She further noted that “per evidence-based medical literature, including Lexicomp regarding Topirimate drug information: CrCl =70 mL/minute/1.73 m2: There are no dosage adjustments provided in the manufacturer’s labeling. The pharmacokinetics of topiramate are linear with dose proportional increases in plasma concentration over the dose range studied (200 to 800 mg/day). The mean plasma elimination half-life is 21 hours after single or multiple doses. With the prescription he was given, the maximum dose that he would have taken would have been 200 mg/day in the 4th week of the 30 day titration.”

The Board finds the medical opinions of record highly probative in determining whether the Veteran’s kidney stones were caused or aggravated by a service-connected disability, or medication used to treat such, as they are shown to have been based on a review of the Veteran’s record and are accompanied by a sufficient explanation. Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008). The March 2019 physician provided a detailed account of the Veteran’s use of the relevant medications and provided a persuasive explanation for why his kidney stones were not likely to be related to his use of such.

The Veteran contends in a May 2019 written statement that the opinions of record are inadequate as they do not address issues including how long a drug would remain in his system after he stopped taking it, as well as challenging the scientific basis of a study cited by the VA physician. The Veteran has not demonstrated that he has the qualifications to challenge either the medical conclusions or scientific studies at issue. This issue is medically complex and requires knowledge of interpretation of complicated diagnostic medical testing, and he is not competent to provide a nexus opinion in this case. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007).

Since the competent and probative evidence of record fails to indicate that the Veteran’s GERD had onset in, or is otherwise related to service; or, that it was either caused or aggravated by service-connected disabilities, service connection is not warranted. 

As the preponderance of the evidence is against the claim under any applicable theory of service connection, the benefit of the doubt rule does not apply. 38 U.S.C. § 5107 (b); Gilbert, 1 Vet. App. at 53-56.

Disability Ratings

Disability ratings are determined by applying a schedule of reductions in earning capacity from specific injuries or a combination of injuries that is based upon the average impairment of earning capacities. 38 U.S.C. § 1155. Each disability must be viewed in relation to its entire history, with emphasis upon the limitations proportionate to the severity of the disabling condition. 38 C.F.R. § 4.1.

Where there is a question as to which of the two disability evaluations is applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7. After careful consideration of the evidence of record, any reasonable doubt remaining will be resolved in favor of the Veteran. 38 C.F.R. § 4.3. When the appeal arises from an initial assigned rating, consideration must be given to whether staged ratings should be assigned to reflect entitlement to a higher rating at any point during the pendency of the claim. See Fenderson v. West, 12 Vet. App. 119, 126 (1999).

When rating the Veteran’s service-connected disability, the entire medical history must be reviewed. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). The Board must also fully consider the lay assertions of record. See Layno v. Brown, 6 Vet. App. 465, 470 (1994).

When evaluating musculoskeletal disabilities, VA may, in addition to applying schedular criteria, consider granting a higher rating in cases in which the claimant experiences additional functional loss due to pain, weakness, excess fatigability, or incoordination, to include with repeated use or during flare-ups, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45 (2016); DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995). The provisions of 38 C.F.R. § 4.40 and 38 C.F.R. § 4.45 are to be considered in conjunction with the diagnostic codes predicated on limitation of motion. See Johnson v. Brown, 9 Vet. App. 7 (1996).

5. Entitlement to an initial rating in excess of 10 percent for right knee patellofemoral syndrome

The April 2019 RAMP decision granted service connection for right knee patellofemoral syndrome. An initial 10 percent rating was granted from November 2011. The Veteran contends that he is entitled to a higher rating.

The RO granted a 10 percent rating based on painful motion of the right knee.

Limitation of motion of the knee is contemplated in 38 C.F.R. § 4.71a, Diagnostic Codes 5260 and 5261. Normal range of knee motion is 140 degrees of flexion and zero degrees of extension. 38 C.F.R. § 4.71, Plate II. 

Diagnostic Code 5260 provides for a zero percent rating where flexion of the leg is limited to 60 degrees. For a 10 percent rating, flexion must be limited to 45 degrees. A 20 percent rating is warranted where flexion is limited to 30 degrees. A 30 percent rating may be assigned where flexion is limited to 15 degrees. 

Diagnostic Code 5261 provides for a 10 percent rating requires extension limited to 10 degrees. A 20 percent rating is warranted where extension is limited to 15 degrees. A 30 percent rating may be assigned where the evidence shows extension limited to 20 degrees. For a 40 percent rating, extension must be limited to 30 degrees. Finally, where extension is limited to 45 degrees a 50 percent rating may be assigned. 

Diagnostic Code 5257 provides for assignment of a 10 percent rating when there is slight recurrent subluxation or lateral instability, a 20 percent rating when there is moderate recurrent subluxation or lateral instability, and a 30 percent evaluation for severe recurrent subluxation or lateral instability. 

VA’s General Counsel has stated that when a knee disorder is rated under 38 C.F.R. § 4.71a, DC 5257 and an appellant also has limitation of knee motion which at least meets the criteria for a noncompensable evaluation under 38 C.F.R. § 4.71a, DC 5260 or 5261, separate evaluations may be assigned for arthritis with limitation of motion and for instability. However, General Counsel stated that if an appellant does not meet the criteria for a noncompensable rating under either Diagnostic Code 5260 or DC 5261, there is no additional disability for which a separate rating for arthritis may be assigned. VAOPGCPREC 23-97 (July 1, 1997), published at 62 Fed. Reg. 63,604 (1997). If a rating is assigned under the provisions for other knee impairment (38 C.F.R. § 4.71a, Code 5257) a separate 10 percent rating may be assigned where some limitation of motion, albeit noncompensable, has been demonstrated. See VAOPGCPREC 9-98, 63 Fed. Reg. 56,704 (1998). 

VA’s General Counsel has also stated that separate ratings under Diagnostic Code 5260 (limitation of flexion of the leg) and Diagnostic Code 5261 (limitation of extension of the leg) may be assigned for disability of the same joint. VAOPGCPREC 9-04 (September 17, 2004), published at 69 Fed. Reg. 59,990 (2004).

The rating schedule also provides that dislocation of semilunar cartilage with frequent episodes of “locking,” pain, and effusion into the joint, warrants a 20 percent evaluation. 38 C.F.R. § 4.71a, DC 5258. Diagnostic Code 5259 provides for the assignment of a maximum 10 percent rating based on symptomatic removal of the semilunar cartilage. 38 C.F.R. § 4.71a, DC 5259.

On VA examination in January 2019, the Veteran reported that his right knee gave out on him a year ago. Currently, the right knee pain was intermittent at 6/10. The pain was worse with cold or hot weather. The Veteran reported increased pain in the knee with cold or prolonged standing. On examination, flexion of the right knee was from zero to 125 degrees. Extension was from 125 to zero degrees. The examiner noted pain at the end range of flexion. There was evidence of pain with weight-bearing. There was no crepitus. There was no additional functional loss or range of motion after three repetitions. Pain, weakness, fatigability or incoordination did not significantly limit functional ability with repeated use over a period of time. Muscle strength testing was normal, and there was no muscle atrophy. There was no ankylosis of the right knee. There was no history of recurrent subluxation or lateral instability. Joint stability testing was normal. The examiner noted that the Veteran reported shin splints with running. The Veteran indicated that he occasionally used crutches or a cane. There was no evidence of arthritis of the right knee.

In an addendum dated in April 2019, the examiner noted that flare-ups of the right knee condition would occur daily in cold weather. During these flare-ups, the Veteran’s knee pain would go from 0 to 6/10. The duration of the flare-up would be about four hours. The examiner stated that there would be no decreased range of motion in repeated range of motion testing.

The Veteran is currently assigned a 10 percent rating based on limitation of motion. After reviewing the evidence of record, the Board finds that the Veteran is not entitled to a separate 10 percent rating for limited flexion under DC 5260. The VA examination report shows that the Veteran’s right knee flexion has not been limited to less than 125 degrees, even with consideration of functional loss due to pain. Flexion in the knee does not more nearly approximate 45 degrees so as to warrant assignment of a separate, 10 percent rating under DC 5260 pursuant to VAOPGCPREC 9-2004. 

The Veteran’s extension has not been limited to more than zero degrees. A separate 10 percent under DC 5261 requires extension limited to 10 degrees. 

A separate, compensable rating under DC 5257 is warranted if there is subluxation or lateral instability of the knee. Here, the evidence does not warrant a separate, compensable rating for right knee instability. The examination found no evidence of instability. As such, a separate compensable rating for right knee instability or subluxation is not warranted.

6. Entitlement to an initial rating in excess of 20 percent for bilateral pes planus and plantar fasciitis 

The April 2019 RAMP decision granted service connection for bilateral pes planus with plantar fasciitis based on the theory of aggravation of a preexisting disability. 

In cases involving aggravation during active service, the rating will compensate only the degree of disability over and above the degree of disability existing at the time of entrance into active service. It is necessary to deduct from the present rating the degree, if ascertainable, of the disability existing at the time of entrance into active service. 38 C.F.R. §§ 3.322 (a), 4.22.

In the April 2019 RAMP decision, the RO determined that the pre-existing level of disability for bilateral pes planus with plantar fasciitis would have met the criteria for a 10 percent evaluation as the evidence showed mild pes planus. Further, the RO determined that following aggravation, the disability is 30 percent disabling because of a severe level of disability shown on examination in January 2019. Because the Veteran’s disability met the criteria for a 10 percent evaluation prior to the aggravation, the RO found that the level of aggravation resulted in a 20 percent rating.

The Veteran contends that the RO misapplied Diagnostic Code 5276 in finding his bilateral pes planus met the criteria for a 10 percent rating prior to aggravation.

Pes planus is rated under the criteria of 38 C.F.R. § 4.71a, Diagnostic Code 5276 (flatfoot, acquired) as follows. Mild pes planus (symptoms relieved by built-up shoe or arch support) is rated as noncompensable for unilateral or bilateral disability. Moderate pes planus (weight-bearing line over or medial to the great toe, inward bowing of the Achilles tendon, pain on manipulation and use of the feet) is rated at 10 percent for unilateral or bilateral disability. Severe pes planus (objective evidence of marked deformity such as pronation or abduction, accentuated pain on manipulation and use, indication of swelling on use, callosities) is rated at 20 percent if unilateral and 30 percent if bilateral. Pronounced pes planus (marked pronation, extreme tenderness of plantar surfaces of the feet, marked inward displacement and severe spasm of the Achilles tendon on manipulation, not improved by orthopedic shoes or appliances) is rated at 30 percent if unilateral and at 50 percent if bilateral.

Service treatment records show that the Veteran had bilateral pes planus prior to service. A June 1989 examination for enlistment in the Army Reserve shows that he had severe pes planus, but that a waiver was later granted. In that regard, a February 1990 letter from the Veteran states that he did know that he had pes planus prior to the Army’s physical examination and he did not have any problems with his feet. Then, a July 1997 examination for enlistment in the Air Force Reserve shows that he had mild pes planus. In October 1997, he was given a provisional diagnosis of severe pes planus and scheduled for a consult, which revealed a diagnosis of plantar fasciitis.

On a January 2019 VA examination the examiner diagnosed pes planus and plantar fasciitis of both feet. The Veteran reported that most of his left foot pain was at the base – the medial longitudinal arch and the top of the foot, at the instep. His right foot pain was mostly in the longitudinal arch and the lateral foot. There was also shooting pain at the top of the foot. Currently, the pain was constant at the top of the foot, and at the instep. The Veteran stated that he could not balance himself on the right foot. He said that he lost the “push” motion to get off the foot with walking or pushing off. The Veteran reported pain with walking. 

On examination, the Veteran had pain on use of both feet. The pain was accentuated on use of both feet. There was pain on manipulation of each foot. The pain was accentuated on manipulation of each foot. There was indication of swelling on use. There were no characteristic callouses. The Veteran has tried arch supports, but he remained symptomatic.

The Veteran did not have extreme tenderness of plantar surfaces on one or both feet. He had decreased longitudinal arch height of both feet on weight-bearing. There was no objective evidence of marked deformity of one or both feet (pronation, abduction etc.). There was no marked pronation of one or both feet. The weight-bearing line fell over or medial to the great toe on both feet. There was no other lower extremity deformity other than pes planus, causing alteration of the weight-bearing line. The Veteran did not have “inward” bowing of the Achilles tendon of either foot. The Veteran did not have marked inward displacement and severe spasm of the Achilles tendon (rigid hindfoot) on manipulation of one or both feet. He did not have Morton’s neuroma or metatarsalgia. There were no hammertoes and no hallux valgus. The examiner noted evidence of pain on passive range of motion testing and evidence of pain when the joint is used in non- weight bearing. The Veteran was noted to occasionally use a cane or crutches. 

The January 2019 examination results did not reflect symptoms contemplated by the higher 50 percent criteria, as marked pronation, extreme tenderness of plantar surfaces of the feet, marked inward displacement and severe spasm of the Achilles tendon on manipulation, not improved by orthopedic shoes or appliances. Accordingly, the evidence demonstrates that the Veteran’s bilateral pes planus is properly evaluated as severe as contemplated by a 30 percent rating.

As noted, in this case it is necessary to deduct from the present degree of disability, the degree of disability existing prior to service. 38 C.F.R. § 4.22.

However, in this case, the Veteran’s bilateral pes planus was described as mild at his entrance into the relevant period of service in July 1997. Mild bilateral pes planus warrants a zero percent rating under DC 5276. 

As the RO has misapplied the Diagnostic Code 5276 in finding that mild bilateral pes planus would be rated 10 percent, the Board concludes that there is no basis for reducing the current rating, and a 30 percent initial rating is warranted.

38 U.S.C. § 1151

Pursuant to 38 U.S.C. § 1151, compensation shall be awarded for a qualifying additional disability as if such disability were service connected. For the purposes of this section, a qualifying additional disability is one that was not the result of a veteran’s own willful misconduct and one for which there is actual and proximate causation. 38 U.S.C. § 1151. To determine whether a veteran has an additional disability, VA compares the veteran’s condition immediately before care, treatment, examination, or services, with the state of the condition after such actions have been completed. 38 C.F.R. § 3.361 (b). 

To establish actual causation, the evidence must show that the hospital care, medical or surgical treatment, or examination resulted in the veteran’s additional disability or death. 38 C.F.R. § 3.361 (c). Merely showing that a veteran received care, treatment, or examination and that the veteran has an additional disability does not establish cause. Id. Hospital care, medical or surgical treatment, or examination cannot cause the continuance or natural progress of a disease or injury for which the care, treatment, or examination was furnished unless VA’s failure to timely diagnose and properly treat the disease or injury proximately caused the continuance or natural progress. 38 C.F.R. § 3.361 (c)(2). The provision of training and rehabilitation services or CWT program cannot cause the continuance or natural progress of a disease or injury for which the services were provided. Id. 

The proximate cause of a disability is the action or event that directly caused the disability, as distinguished from a remote contributing cause. 38 C.F.R. § 3.361 (d). This may be shown through two means: (1) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, treatment, or examination; or (2) by an event not reasonably foreseeable. 38 C.F.R. § 3.361 (d)(1)-(2). To establish that carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on VA’s part in furnishing hospital care, treatment, or examination proximately caused a veteran’s additional disability, it must be shown that the care, treatment, or examination caused the veteran’s additional disability and (i) VA failed to exercise the degree of care that would be expected of a reasonable healthcare provider; or (ii) VA furnished the hospital care, treatment, or examination without the Veteran’s, or in certain cases a designated representative’s, informed consent. 38 C.F.R. § 3.361 (d)(1).

7. Entitlement to compensation under 38 U.S.C. § 1151 for kidney stones

8. Entitlement to compensation under 38 U.S.C. § 1151 for hematuria

The AOJ in the April 2019 RAMP decision rendered favorable findings that the Veteran was diagnosed with kidney stones and hematuria in 2015.

The Veteran asserts that he was improperly prescribed topiramate for headaches, as he was taking the hypertensive medication hydrochlorothiazide which interacted negatively to increase the level of topiramate in his body and resulted in his kidney stones and hematuria. 

The Veteran submitted a medical treatise noting that hydrochlorothiazide increases the level of topiramate and that the addition of hydrochlorothiazide to topiramate therapy may require an adjustment of the topiramate dose. 

A VA medical opinion was obtained in November 2015. The physician found it was not at least as likely as not that the claimed disability of kidney stones with hematuria was caused by or became worse as a result of the VA treatment at issue. The physician noted that the Veteran had been prescribed only 39 tablets of topiramate in August 2014 without renewal and such a small amount of topiramate used for a very short period of time would not cause any increased predisposition to kidney stones. The physician noted that increased predisposition to kidney stones is a rare known side effect of longterm treatment with topiramate. The physician noted that the Veteran was treated appropriately for kidney stones and suffered no permanent disability from kidney stones. He noted there was no evidence of any negligence on the part of VA in the care and treatment of the Veteran.

A VA physician reviewed the record in March 2019 and found it less likely than not that the Veteran’s kidney stones and/or hematuria were caused by or became worse as a result of the medications prescribed. She found it less likely than not that the additional disability resulted from the attending VA personnel’s failure to follow the appropriate standard of care; less likely than not that the additional disability resulted from an event that could not have reasonably been foreseen by a reasonable healthcare provider; and less likely than not that failure on the part of VA to timely diagnose and/or properly treat the claimed disease or disability allowed the disease or disability to continue to progress.

She noted that “there is no evidence to suggest the HCTZ interacted negatively to increase the level of topiramate in his body and thus resulted in his kidney stones. From his records and labs: There is no evidence to suggest he had elevated blood or kidney levels of topiramate. The Veteran was only prescribed a 1 month supply of Topiramate 50 mg (39 tablets for the 30 day titration to be taken starting with 1/2 tablet for the first week and then titrating up over the next 3 weeks to a total of 100 mg the 4th week). This was a low dose, used for a very short period. He had no refills; and the prescription expired on 8/30/14. The Topiramate dose prescribed is the dosing schedule recommended on the manufacturer’s label when initiating topiramate. There was no indication to prescribe a lower dose of topiramate given the Veteran’s use of hydrochlorothiazide. No dose adjustment is necessary when the GFR is >70, regardless of whether or not he is on Hydrochlorothiazide.”

She further noted that “per evidence-based medical literature, including Lexicomp regarding Topirimate drug information: CrCl =70 mL/minute/1.73 m2: There are no dosage adjustments provided in the manufacturer’s labeling. The pharmacokinetics of topiramate are linear with dose proportional increases in plasma concentration over the dose range studied (200 to 800 mg/day). The mean plasma elimination half-life is 21 hours after single or multiple doses. With the prescription he was given, the maximum dose that he would have taken would have been 200 mg/day in the 4th week of the 30 day titration.”

After careful review, the Board finds that the evidence fails to show that the Veteran has additional disability due to the medications prescribed for his service connected headaches disability. 

The November 2015 and March 2009 VA examiners’ opinions did not find evidence of additional disability in the form of kidney stones or hematuria that were related to the VA medication treatments. They found it less likely than not that the Veteran’s kidney stones and/or hematuria were related to his use of the medications in question.

In short, there is no competent or probative medical evidence of record showing an additional disability, claimed as kidney stones and hematuria, related to the prescribed medications. Consequently, the Board need not reach the question of whether additional disability resulted from carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault as a result of VA prescribing of these medications. However, it is noted that the November 2015 and March 2019 VA examiners found no evidence of the same in their review of the file.

The Board considered the lay evidence provided in support of establishing entitlement to VA compensation by way of Section 1151. The Board is not unqualifiedly rejecting lay evidence but, instead, finds that it is not sufficient to substantiate the claim. In general, whether considering the claim under the Section 1151 theory, a determination as to the nature and etiology of the current claimed disabilities is medically complex in nature. See Jandreau v. Nicholson, 492 F.3d 1372, 1977 (Fed. Cir. 2007). Thus, the Veteran, as a layperson, is not competent to offer a medical opinion as to the cause of his kidney stones and/or hematuria because he has not demonstrated that he possesses the requisite specialized knowledge. Such an opinion requires medical expertise, and therefore, the Veteran is not competent to offer a medical opinion regarding such a complex medical question.

As noted above, the Veteran contends in a May 2019 written statement that the opinions of record are inadequate as they do not address issues including how long a drug would remain in his system after he stopped taking it, as well as challenging the scientific basis of a study cited by the VA physician. The Board again notes that the Veteran has not been shown to have the requisite knowledge to challenge the VA physician’s opinion on that basis.

Despite the contentions otherwise, the Veteran has not submitted persuasive evidence showing his kidney stones and/or hematuria are related to VA treatment. A veteran bears the evidentiary burden to establish all material elements of a claim. See 38 U.S.C. § 5107 (a); Fagan v. Shinseki, 573 F.3d 1282, 1287-88 (2009). The competent evidence of record, to include the November 2015 and March 2019 persuasive and probative medical opinions, weighs against granting the claim based on 38 U.S.C. § 1151. 

As the preponderance of the evidence is against the claim, the benefit-of the-doubt doctrine is not applicable here. See 38 U.S.C. § 5107 (b); 38 C.F.R. § 3.102; Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert v. Derwinski, 1 Vet. App. 49, 55-56 (1990). Therefore, compensation under 38 U.S.C. § 1151 is not warranted.

REASONS FOR REMAND

1. Entitlement to service connection for a right hip disability is remanded.

2. Entitlement to service connection for a left hip disability is remanded.

The Veteran contends that he has a bilateral hip disability that either was incurred in the motor vehicle accident in service in September 1990 or is related to his service-connected disability of bilateral pes planus with plantar fasciitis.

A VA examiner in January 2019 stated that “the condition claimed (Bilateral hips) is less likely as not (50% or greater probability) that the hip condition incurred in or caused by the claimed in-service injury, event or illness. Rationale: Given the history, physical examination and review of the files, not finding evidence for the hip condition. No evidence of pain in the hips from the MVA accident 1990. The Veteran’s bilateral hip condition is not proximately due, to a result of, or aggravated by his claimed bilateral pes planus. Rationale: Not finding association with the feet at this time.”

The examiner did not provide a sufficient rationale for the nexus opinion. Once VA undertakes the effort to provide a medical examination or opinion, it must provide an adequate one. Barr v. Nicholson, 21 Vet. App. 303, 311-12 (2007).

This is a pre-decisional duty to assist error requiring remand under the AMA and RAMP.

3. Entitlement to service connection for a left knee disability is remanded.

The Veteran contends that he has a left knee disability that either was incurred in the motor vehicle accident in service in September 1990 or is related to his service-connected disability of bilateral pes planus with plantar fasciitis.

A January 2019 VA examiner opined that the Veteran’s left knee condition was “less likely as not (50% or greater probability) proximate due to the left foot condition and subsequent bilateral feet condition in the service. Rationale: Given the history, physical examination and review of the files, not finding evidence for the left knee condition. If any further evidence, please forward. It is not likely that there is a direct correlation in regards to if the veteran’s claimed bilateral knee condition and the motor vehicle accident 1990.”

The examiner did not provide a sufficient rationale for the nexus opinion. Once VA undertakes the effort to provide a medical examination or opinion, it must provide an adequate one. Barr v. Nicholson, 21 Vet. App. 303, 311-12 (2007).

This is a pre-decisional duty to assist error requiring remand under the AMA and RAMP.

The matters are REMANDED for the following action:

Return the file to the January 2019 examiner who provided the opinions addressing the Veteran’s left knee and bilateral hip claims for an addendum opinion. 

If that examiner is unavailable, then the file should be reviewed by clinician with sufficient expertise to determine the nature and etiology of the Veteran’s claimed left knee and bilateral hip disorders. If the providing examiner determines that a clinical evaluation is necessary in order to provide the opinions requested, then one should be provided and all indicated tests and studies performed. The electronic claims file must be made available to the examiner. 

After review of the evidence of record, and with consideration of the Veteran’s statements, the examiner must:

(a) Provide a current diagnosis for any and all left knee, right hip, and left hip disorders found extant. If the Veteran previously had any such medical condition, but it is no longer extant, when did that condition resolve?

(b) For each diagnosed disorder, is it at least as likely as not (i.e., at least equally probable) that the disorder had its onset directly during the Veteran’s service or is otherwise causally related to any event or circumstance of his service, to include the motor vehicle accident in September 1990? 

(c) If not directly related to service on the basis of question (b), is any left knee, right hip, or left hip condition proximately due to, the result of, or caused by any other medical condition(s), to include pes planus with plantar fasciitis? If so, please identify the primary medical condition(s). 

(d) If not caused by another medical condition, has any left knee, right hip, or left hip disorder been aggravated (made worse or increased in severity) by any other medical condition(s)? If so, please identify the primary medical condition(s). Also, please identify whether any increase in severity was due to the natural progress of the disease.

In answering these questions, please articulate the reasons underpinning each conclusion. That is, (1) identify what facts and information, whether found in the record or outside the record, support the conclusion, and (2) explain how that evidence justifies the conclusion.

 

 

D. JOHNSON

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board M. G. Mazzucchelli, Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.